JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* UNIÓN DE TRABAJADORES DE LA INDUSTRIA GASTRONÓMICA, LOCAL 610, demandada.

*Número:* O-80-21     *Resuelto:* 9 de octubre de 1980

238

*Gladys J. Ramos Rosario, César A. Vélez Miranda* y *Federico Díaz Ortiz,* abogados de la peticionaria; *Francisco Aponte Pérez,* abogado de la demandada.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Aunque aflora en otras áreas del derecho, una característica que sobresale en el campo de las relaciones obrero-patronales es el número de normas inspiradas y originadas en el Poder Judicial.[1] Ello se explica si recordamos que el dinamismo y fluidez inherentes en los intereses en conflicto —capital y mano de obra— impiden de ordinario al Poder Legislativo anticipadamente prever, pautar y reglar, con mayor detalle, las situaciones cambiantes. El análisis del caso de autos nos mueve a otorgarle, con las aclaraciones de rigor, imprimátur a la doctrina invocada para su solución por la Junta de Relaciones del Trabajo, acuñada en la frase de "deber de justa representación" de las uniones.

# I

Nuestro dictamen exige una corta, pero escrupulosa especificación de hechos, recordando que en esta tarea "el juez debe convertirse en un frío observador, huyendo de todo subjetivismo, fijándolos con brevedad, claridad e impersonalidad; pudiera decirse que es una función notarial si no tuviera que analizarlos, aclarando su motivación, sus efectos y los fines procurados por su autor". Entrena Klett, *La Equidad y el Arte de Juzgar*, Pamplona, Ed. Aranzadi, 1979, pág. 13.

Camilo Oquendo[2] renunció el 4 de octubre de 1976 a su empleo en el Hotel Caribe Hilton. Al día siguiente fue a la oficina de la Unión de Trabajadores de la Industria Gastronómica, Local 610, representante de los obreros de dicha

---

[1] A manera de ejemplo, el arbitraje laboral. Véase, *Colón Molinary v. A.A.A.*, 103 D.P.R. 143, 154–155 (1974).

[2] Previa lectura de la prueba, consideramos carente de méritos la argumentación de la Unión querellada en torno a que el récord ante el foro administrativo no contiene evidencia sustancial para sostener las conclusiones y hechos en que se apoya la querella. En cuanto a la medida (*test*), consúltese *J.R.T.* v. *Escuela Coop. E. M. de Hostos*, 107 D.P.R. 151 (1978).

hospedería según convenio colectivo vigente desde 24 de mayo de 1976 hasta el 24 de mayo de 1979, a inquirir si podía cobrar *entonces* el dinero acumulado como "incentivo" en calidad de licencia de enfermedad no utilizada.[3] Saúl Ortiz, delegado de la Unión, le informó que tenía que esperar hasta el 15 de diciembre en que dicho incentivo se pagaba.

Así las cosas, el 15 de diciembre de 1976 Oquendo fue directamente al hotel. En ausencia del Director de Personal, su secretaria le notificó que por haber renunciado el 4 de octubre, no era elegible y había perdido el derecho a cobrarlo. Le fueron satisfechos $177.00 por vacaciones regulares y $75.00 del bono de navidad correspondiente. Ante esta negativa, recurrió el mismo día a la Unión, siendo atendido nuevamente por Ortiz, quien le pidió que regresara el próximo lunes, porque se iba de vacaciones.

El lunes 20 de diciembre de 1976, volvió. Esta vez lo atendió Rangel Meléndez, Vicepresidente de la Unión, debido a que Ortiz no quiso intervenir. Ese día Meléndez planteó el asunto ante el Patrono. La gerencia del hotel expuso su criterio de que no efectuaría el pago, pues Oquendo había renunciado en octubre. Levantó la defensa de prescripción, aduciendo que la queja debió formularse dentro de los 5 días siguientes a la renuncia. Ante esta situación, Meléndez se abstuvo de continuar ulteriores diligencias y reclamos, pues le pareció "imprudente . . . llevar un caso que había prescrito".

No conforme, el obrero Oquendo instó queja contra la Unión. La Junta de Relaciones del Trabajo de Puerto Rico expidió querella y previo trámites resolvió que al "no representar adecuadamente al Querellante en su reclamación con-

---

[3] El Art. XXIII, en síntesis, reconoce que será pagadera no más tarde del 15 de diciembre de cada año y computada hasta el 30 de noviembre del año en cuestión. El beneficio no excedería de un pago equivalente a quince (15) días. Conforme al Art. XIII, el empleado acumularía un máximo de treinta (30) días por licencia de enfermedad, y el exceso —hasta 15 días— se le pagaría.

tra el Patrono por no continuar en el Segundo Paso que establece el Artículo XV del Convenio Colectivo, la tramitación de una querella razonablemente argumentable, la Unión Querellada violó su deber de justa representación para el querellante, incurriendo en una violación del Artículo XV del Convenio Colectivo que a su vez constituye una práctica ilícita de trabajo según definida en el Artículo 8(2)(a) de la Ley de Relaciones del Trabajo". Basó este dictamen en el siguiente análisis:

En el presente caso el Representante Sindical tenía la discreción de calibrar los méritos de la querella, pero ante la defensa frívola de prescripción aducida por el Patrono, la querellada erró en su juicio al allanarse a la misma cuando ciertamente la acción no había prescrito.

Aún en la alternativa de que la defensa de prescripción tuviese mérito y la misma prosperase, consideramos que hubo un claro incumplimiento de la obligación contractual de la unión Querellada al no someter a tiempo la querella conforme a los términos del convenio colectivo el cual ella negoció y se obligó a cumplir.

En este caso particular, cuando el Patrono expuso la defensa de prescripción, la Unión erró en su juicio ya que el término para radicar la querella no vencía sino hasta el 22 de diciembre de 1976. Consideramos que para que una Unión rehúse procesar una querella, debe estar convencida de que la misma es frívola e inmeritoria; pero está en la obligación de procesar las que son meritorias o razonablemente argumentables.

Al momento que una Unión deja de llevar una controversia meritoria o razonablemente debatible, incurre en una indebida representación y en consecuencia en una práctica ilícita de trabajo el significado del Artículo 8(2)(a) de la Ley.

Lo que nuestra Junta ha reconocido es que las Uniones no están obligadas a llevar controversias claramente inmeritorias, pero ante la duda consideramos que el trabajador debe tener accesible un foro en el que se dilucide su queja, agravio o querella.

Igualmente, creemos que una Unión no debe basar su juicio en defensas inmeritorias de prescripción. El hacerlo así constituye una crasa negligencia de su parte.

En consecuencia, emitió orden de cese y desista; que se pagara al querellante el equivalente a los trece (13) días acumulados; y que se fijara la orden en sitios públicos. No habiendo cumplido la Unión, la Junta acudió ante nos solicitando diéramos virtualidad a su dictamen. Emitimos orden de mostración de causa.

En contra de ponerla en vigor, la Unión aduce que la determinación sindical fue razonable pues: "1. La gerencia no iba a hacer el pago porque Oquendo había renunciado el 4 de octubre[;] 2. La gerencia alegó que al momento de él renunciar debió haber hecho el planteamiento dentro de un máximo de cinco días a partir de la fecha de haber renunciado y por eso se negaron a ver la vista para entrar en los méritos del caso[;] 3. No había precedente establecido y nunca se pagó a empleado que hubiese renunciado como tampoco se había radicado querella en caso alguno [y;] 4. El propósito del pago era eliminar el ausentismo y desalentar el uso de días por enfermedad y no el pago de vacaciones acumuladas." Arguye que "[l]a decisión de la Unión querellada de no apelar la querella al segundo paso estuvo predicada en fundamentos racionales de falta de méritos sustantivos y procesales. Dicha decisión se tomó en vista a los planteamientos de peso aducidos por el patrono y a la creencia fundada de que la querella carecía de méritos. La actuación de la Unión está exenta de capricho u arbitrariedad. No hay prueba de hostilidad del representante sindical para el empleado. No abusó la Unión de su discreción y no violó el convenio colectivo por faltar a su deber de debida representación".

## II

Con este trasfondo de hechos advertimos que la solución del caso gira en torno a una doctrina de rúbrica eminentemente judicial, a saber, *el deber de justa representación* (*duty of fair representation*) promulgada por el Tribunal Supremo federal en *Vaca* v. *Sipes*, 386 U.S. 171 (1967) y

reiterada en *Hines* v. *Anchor Motor Freight, Inc.*, 424 U.S. 554 (1976). En esencia la misma proclama la obligación de toda unión de servir de buena fe, sin discrimen ni arbitrariedad, a los intereses de sus representados miembros. Mucho antes de su adopción formal, el principio había sido objeto de múltiples señalamientos por comentaristas([4]) y tribunales.([5])

Aunque se reconoce la dificultad de enunciar los criterios determinantes, en términos generales se acepta que la Unión no viene obligada a procesar y llevar a arbitraje toda queja y, a tal efecto, posee un alto grado de discreción. Sin embargo, "[l]a conducta de la unión no debe ser intencionalmente arbitraria, caprichosa o discriminatoria. La negativa de la Unión en procesar la queja no debe ser el resultado de una apatía o prejuicio, o de una indisponibilidad de incurrir en gastos a nombre de los que no son unionados. Sus

---

([4]) Cox, *The Duty of Fair Representation*, 2 Vill. L. Rev. 151 (1957); Gregory, *Fiduciary Standards and the Bargaining and Grievance Process*, 8 Lab. L.J. 843 (1957); Wellington, *Union Democracy and Fair Representation: Federal Responsibility in a Federal System*, 67 Yale L.J. 1327, 1331–1343 (1958); K. Hanslowe, *Individual Rights in Collective Labor Relations*, 45 Cornell L.Q. 25, 45–52 (1959); A. Blumrosen, *The Worker and Three Phases of Unionism: Administrative and Judicial Control of the Worker-Union Relationship*, 61 Mich. L. Rev. 1435, 1469–1472 (1963). Feller, *A General Theory of the Collective Bargaining Agreement*, 61 Calif. L. Rev. 663 (1973); Summers, *Individual Rights in Collective Agreements and Arbitration*, 37 N.Y.U.L. Rev. 362 (1962); Lewis, *Fair Representative in Grievance Representation*, 118 University Pa. L. Rev., 1036 (1970); J. Yablonski, *Refusal to Process a Grievance, The NLRB and the Duty of Fair Representation: A Plea for Pre-Emption*, 26 U. Pitt. L. Rev. 593, (1965); J. Balwin, Note: *The Duty of Fair Representation and its Applicability When a Union Refuses to Process an Individual Grievance*, 20 S.C. L. Rev. 253 (1958–59); y Note, *The Exhaustions of Intra-Union Procedures in Duty of Fair Representation Cases*, 32 Rutgers L. Rev. 520 (1979).

([5]) En el foro judicial su génesis se remonta a *Steele* v. *L. & N.R. Co.*, 323 U.S. 192 (1944). Para casos más recientes, véase: *Bundy* v. *Penn Central Company*, 455 F.2d 277 (1972); *Davidson* v. *International U. U. A.*, A.&A.I.W., Loc. No. 1189, 332 F.Supp. 375 (1971); *Matzer* v. *Florsheim Shoe Company*, 270 N.E.2d 75 (1971). Consúltese: *Union-Failure to Process Grievance*, 34 A.L.R.3d 884 (1970); *Labor Unions-Employee Grievances*, 5 A.L.R. Fed. 372 (1970).

decisiones respecto a las quejas individuales deben ser honestas y razonables. El rechazo por la Unión de la queja debe haber sido *sobre los méritos*, en un ejercicio honesto y fundado de discreción *previa una justa y completa investigación*. En ningún respecto, el rechazo puede haber sido injusto. No puede haber mediado fraude o mala fe. El agente representativo no puede haber actuado de manera negligente". Hanslowe, *op. cit.*, págs. 46–47.

■ La doctrina intenta superar los intereses tripartitas susceptibles de chocar en este tipo de relación, a saber, los del obrero —que se estima acreedor a una total e ilimitada representación; los de la Unión, elevada por ley a la categoría de única representante de los obreros; y los del patrono —quien al suscribir un convenio colectivo confía en evitar la tramitación indiscriminada, costosa y directa de toda queja imaginable. Para éste, ciertamente es más conveniente y sabio obligarse a un mecanismo para solventar querellas con una sola parte: la Unión. "Cuando un patrono y una unión acuerdan que una queja individual no será procesada están simultáneamente realizando dos funciones: (1) determinando los derechos individuales del quejoso; y (2) llevando a cabo la tarea de la negociación colectiva. Ambas funciones están inextricablemente atadas; una no puede ser perturbada sin afectar la otra. La protección total de los derechos individuales enervaría el proceso de negociación, mientras la máxima protección al proceso borraría los derechos individuales". Yablonski, *op. cit.*, pág. 614.

■ Ahora bien, repetimos que este deber de representación no es irrestricto. Antes de la decisión de *Vaca*, supra, la Junta de Relaciones del Trabajo de Puerto Rico había correctamente apuntado ciertos perfiles de la regla en el caso de *Autoridad de las Fuentes Fluviales (y) Primitivo Landrón*, 4 D.J.R.T. 694, 696 (1962). Allí dijo que "[n]o se puede llegar al extremo de sostener que una organización obrera tiene que defender *todas las reclamaciones de sus miembros*

*por improcedentes que sean.* En el toma y daca de la negociación colectiva ambas partes tienen que proceder con las manos limpias. *El representante de los empleados tiene que calibrar los méritos de las causas que se le encomiendan.* Si el representante colectivo opta ciegamente por luchar todos los casos, asumiendo la posición de que los empleados siempre son los héroes y que el patrono siempre es el villano, se estaría socavando el sistema de la negociación colectiva porque se impediría el desarrollo del clima mutuo de respeto y confianza indispensable para el logro de la paz industrial". (Bastardillas nuestras.) En vista de ello, nos parece prudente apuntar que el criterio de la Junta a los efectos de que la Unión incurre en responsabilidad de negarse a procesar cualquier queja meritoria o razonablemente argumentable —Decisión y Orden, pág. 12— es mucho más amplio que el esbozado en *Vaca* v. *Sipes.* El equilibrio de intereses exige que no vayamos más lejos que la doctrina establecida en el referido caso, por lo cual la Junta debe ajustarse al criterio jurisprudencial allí expuesto en la consideración de casos futuros referentes al procesamiento de quejas presentadas por obreros unionados. R. A. Gorman, *Basic Text on Labor Law*, St. Paul, Minn., West Publishing Co., 1976, pág. 705, *et seq.*

En consonancia con lo expuesto, es fundamental tener presente que la divergencia razonable de criterio respecto a los méritos de una queja per se, no sería suficiente para inferir una violación al trato de buena fe o deducir una conducta arbitraria de una unión. La unión satisface su responsabilidad fiduciaria actuando en relación con la queja de forma diligente y bien intencionada, y cualquier conclusión así adoptada la exime de responsabilidad, no obstante incurriera en error de juicio y a pesar de que posteriormente se determine que, en efecto, la queja en cuestión tenía méritos. *Vaca* v. *Sipes,* supra, págs. 192–193. Por otro lado, tampoco eximiría de responsabilidad a la Unión la tramitación y procesamiento de una queja hasta su fin, si la diligencia se des-

pliega sin una adecuada representación o sin proveerse una cabal defensa de los intereses del obrero. Es por ello que a los fines de evaluar la suficiencia de la representación, en casos como el presente, es menester cierta evaluación sobre si la queja era o no frívola.

## III

El estado doctrinario expuesto es contrario a la posición de la Unión. A través de sus oficiales, más que simples errores honestos o de juicio valorativos respecto a la situación, incurrió en conducta arbitraria, pues por indolencia y apatía intencional motivó que el patrono pudiera levantar la alegada defensa de prescripción. Su primera acción injustificada y negligente se produce cuando el 4 de octubre, sin siquiera investigar o cotejar la posición del patrono, le informa a Oquendo que el pago del incentivo no procedía en esa fecha, sino hasta el 15 de diciembre. Lo irrazonable de la posición de la Unión y la superficialidad con que trató este asunto, queda evidenciado precisamente por la ausencia de precedentes. No constituye válida excusa el argumento que se aduce respecto a que nunca antes se había radicado querella ni pagado una idéntica. Dicha lógica implicaría que la Unión puede observar impunemente una conducta pasiva en reclamos legítimos de sus miembros, porque son novedosos, independientemente de la razonabilidad de los mismos.

Su segunda arbitrariedad ocurre luego de haber llevado el asunto, aunque alegadamente tardío, a su etapa inicial; al menos debió seguir la mecánica ulterior dispuesta en el segundo paso, sometiéndolo al Comité de Quejas. Correctamente expone la Junta que "la querella era argumentable por las siguientes razones: 1. Si verdaderamente existía duda en torno a cuando surgió la reclamación y si ésta habría o no prescrito era una materia arbitrable sujeta a considerarse en el Comité de Arbitraje[;] 2. Si el hecho del Querellante haber renunciado el 4 de octubre constituyó una renuncia al

pago de licencia por enfermedad no utilizada, era un asunto argumentable ante el Comité de Arbitraje puesto que: (a) el convenio es claro y explícito al conferir este derecho[;] (b) se le estaba privando al Querellante de un posible derecho adquirido bajo los términos de un Convenio[;] 3. El hecho de no haber precedente establecido en manera alguna podía interpretarse como un impedimento para llevar la querella de este empleado particular . . . . Si una decisión no es obligatoria y no sienta precedente alguno para futuras querellas cómo puede alegarse, que el no existir precedente establecido sirva de base para no procesar una querella[; y] 4. [s]i el propósito del pago era eliminar el ausentismo, en el Quid Pro Quo, entre el empleado y su patrono, en este caso el Querellante, motivado por dicho pago, cumplió con su parte, es decir, la eliminación viciosa del uso de días por enfermedad. Restaba pues, por considerar, si el Patrono cumplió con la suya conforme al convenio colectivo".

El manejo perfunctorio de la queja resalta. *Resolvemos que la Unión actuó arbitrariamente y fue indiferente a los reclamos de Oquendo y con ello infringió su deber de justa representación. En consecuencia, se dictará sentencia que ponga en vigor la Orden de la Junta.*

El Juez Asociado Señor Rigau concurre en el resultado sin opinión.