YOLANDA MORALES GONZÁLEZ y OTROS, querellantes y recurrentes, *v.* JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, querellada y recurrida.

*Número:* O-83-162    *Resuelto:* 6 de mayo de 1988

*Demetrio Fernández,* abogado de los recurrentes; *Luis B. Osorio* y *Leticia Rodríguez García,* abogados de la recurrida Junta de Relaciones del Trabajo; *Ruperto J. Robles* y *Ana Belén Frías,* de *Robles & Frías,* abogados del Fondo del Seguro del Estado; *Elías Dávila Berríos* y *Lino Padrón,* abogados de la Hermandad Unión de Empleados del Fondo del Seguro del Estado.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

El caso de epígrafe es secuela de *F.S.E. v. J.R.T.,* 111 D.P.R. 505 (1981). Sobre los hechos no existe controversia; están claramente detallados en el caso anterior. Allí confirmamos la decisión y orden de la Junta de Relaciones del Trabajo de Puerto Rico (Junta) emitida el 1ro de marzo de 1979, que determinó que tanto la Hermandad Unión de Empleados

del Fondo del Seguro del Estado (Unión) como el Fondo del Seguro del Estado (F.S.E.), habían incurrido en prácticas ilícitas de trabajo al excluir a los abogados querellantes y recurrentes de la unidad apropiada. En nuestra opinión concluimos, además, que la actitud arbitraria asumida por la Unión al insistir ante el patrono en excluir a los recurrentes de la unidad apropiada, sin informarles ni darles a éstos participación de índole alguna en el proceso, lesionó los intereses de los abogados querellantes y constituyó un quebrantamiento de su deber de justa y adecuada representación.

Luego de nuestra decisión, la Junta celebró varias vistas y emitió una decisión y orden suplementaria en la cual concedió el remedio que consideró apropiado. De esta decisión recurren los querellantes. Plantean que la Junta erró al hacer la distribución de la responsabilidad por los daños, cuarenta por ciento (40%) el F.S.E. y sesenta por ciento (60%) la Unión, al denegarles los daños líquidos por concepto de penalidad, los intereses, los honorarios de abogado y los daños y angustias mentales.

I

*Distribución de la responsabilidad por los daños*

Los querellantes argumentan que la distribución de la responsabilidad es contraria a la norma establecida en *Vaca v. Sipes*, 386 U.S. 171 (1967), y su progenie; que "el patrono querellado viene obligado a responder [de] la totalidad de . . . los daños resultantes del quebrantamiento . . . [del] Convenio Colectivo" debido a que "[r]ecaía sobre [éste] el fiel cumplimiento de todas las obligaciones relacionadas con las condiciones de empleo", y que si no hubiera consentido "a excluir injustificadamente a los querellantes de la unidad contratante no se hubiera suscitado" la violación de los términos del convenio, y que bajo las circunstancias específicas de este caso el F.S.E. viene obligado a responderle en su totalidad por los daños a los querellantes.

En *J.R.T. v. U.T.I.G.*, 110 D.P.R. 237, 245 (1980), al referirnos a la responsabilidad en que incurre una unión al no cumplir con su deber de ofrecer justa y adecuada representación, expresamos que "[e]l equilibrio de intereses exige que no vayamos más lejos que la doctrina establecida en [*Vaca v. Sipes*, supra, y que] la Junta deb[ía] ajustarse al criterio jurisprudencial allí expuesto en la consideración de casos futuros referentes al procesamiento de quejas presentadas por obreros unionados". En *Morales Torres v. J.R.T.*, 119 D.P.R. 286 (1987), le dimos nuestra aprobación al uso por la Junta de los principios establecidos en *Bowen v. United States Postal Service*, 459 U.S. 212 (1983).

En relación con el remedio a concederse cuando el patrono incumple con el convenio y la unión viola su deber de ofrecerle al empleado una justa y adecuada representación, en *Vaca v. Sipes*, supra,(¹) pág. 197, el Tribunal Supremo de Estados Unidos enunció el siguiente principio normativo: los daños atribuibles solamente al incumplimiento del contrato por parte del patrono no pueden cargársele a la unión, pero tampoco deberá cargársele al patrono cualquier aumento causado por la unión haberse negado a procesar la queja. En *Bowen v. United States Postal Service*, supra, págs. 226–227,(²) el Tribunal amplió la norma al expresar que el patrono

---

(¹) En *Vaca v. Sipes*, 386 U.S. 171 (1967), el empleado fue despedido luego que el doctor del patrono determinó que no estaba físicamente capacitado para llevar a cabo su trabajo. La unión, luego de recibir la evidencia del empleado, trató de recopilar evidencia suficiente para probar el caso y buscarle al empleado un trabajo menos fuerte. También se unió a los esfuerzos del patrono para rehabilitarlo. Sólo cuando estos esfuerzos resultaron infructuosos, fue que la unión concluyó que el arbitraje sería inútil y que la queja debería desestimarse. Bajo estas circunstancias el Tribunal determinó que la unión había cumplido con su deber de representar adecuadamente al empleado.

(²) En *Bowen v. United States Postal Service*, 459 U.S. 212 (1983), el patrono suspendió al empleado sin paga por haber tenido un altercado con otro empleado. El oficial de la unión a cada paso del procedimiento de querella había recomendado que siguieran defendiendo la queja, pero los oficiales a nivel nacional rehusaron llevar el asunto a arbitraje.

que despida a un empleado en violación del convenio será responsable por el salario dejado de percibir, sólo hasta la fecha hipotética en la cual un árbitro hubiese emitido el laudo si la unión hubiese llevado el caso a arbitraje.

Aplicando estos principios,(3) en *J.R.T. v. Unión de Tronquistas*, 117 D.P.R. 790 (1986), sostuvimos la decisión de la Junta al determinar que la unión era responsable del cincuenta por ciento (50%) de las pérdidas sufridas en los ingresos. Allí se trataba de unos despidos por reducción de personal por razones económicas. El convenio disponía que se utilizaría el criterio de antigüedad en la clasificación; el patrono utilizó el de antigüedad en la compañía. Las partes recurrieron a arbitraje y el árbitro falló a favor de la unión. El laudo fue confirmado por este Tribunal. El patrono no cumplió y la unión recurrió a la Junta, ésta se negó a intervenir aduciendo que ya este Tribunal había emitido opinión y sentencia. Es de aquí en adelante que ocurre la falta de adecuada representación de la unión. En *Morales Torres v. J.R.T.*, supra, el incumplimiento con el convenio surgió del no pago de un Bono de Navidad por parte del patrono. La Junta resolvió que el patrono había violado el convenio y la unión su deber de adecuada representación. "[Les] ordenó —en proporción de setenta por ciento (70%) [al patrono] y treinta por ciento (30%) a la Unión— el pago del Bono de Navidad. . . ." Íd., pág. 292. En esa ocasión expresamos que la Junta había actuado correctamente, siguiendo "[l]a norma establecida que ordena tal distribución[, sopesando los inte-

---

(3) La aplicación de estos principios ha suscitado diversas interpretaciones. Sobre el particular, véanse: Comentario, *Apportionment of Damages in DFR/Contract Suits: Who Pays for the Union's Breach*, 1981 Wisc. L. Rev. 155 (1981); S.L. Murray, *Apportionment of Damages in Section 301 Duty of Fair Representation Actions: The Impact of Bowen v. United States Postal Service*, 32 DePaul L. Rev. 743 (1983); R. Kirschner y M. Walfoort, *The Duty of Fair Representation: Implications of Bowen*, 1 The Labor Lawyer 19 (1985).

reses involucrados y el daño,] allí donde la Unión ha contribuido a los daños sufridos por el obrero". Íd., pág. 301.

En todos estos casos la Unión no fue partícipe activa en la práctica ilícita. Su responsabilidad emanó de su pasividad frente a la actuación ilícita del patrono. Ante estas circunstancias es claro que sólo procede que se le condene al pago de los daños que resulten de su inacción o dejadez en procesar el agravio. *Vaca v. Sipes*, supra; *Bowen v. United States Postal Service*, supra; *Czosek v. O'Mara*, 397 U.S. 25 (1970);[4] R.A. Gorman, *Labor Law Basic Text*, St. Paul, West Pub. Co., 1976, pág. 721 y ss.

Ahora bien, en el caso de autos la Junta determinó que el mismo presentaba una "situación particular" distinguible de lo considerado en *Vaca v. Sipes*, supra. Veamos. Cuando por primera vez tuvimos este caso ante nosotros, hicimos constar que del récord surgía que:

> . . . fue la Hermandad y no el Fondo quien promovió la exclusión y, no precisamente de algún abogado en particular, sino de *todos* los abogados incluidos en la unidad apropiada; todo ello en abierta violación del convenio. *F.S.E. v. J.R.T.*, supra, pág. 516.

Con relación a como surgió la controversia dijimos:

> Aparece del récord que el 10 de diciembre el Presidente de la Hermandad, quien es abogado y litiga casos ante el Fondo y la Comisión Industrial, le expresó a un abogado del Fondo su inconformidad por haber recomendado adversamente una petición de paga global para inversiones formulada por un

---

(4) En este caso el Tribunal Supremo de Estados Unidos expresó:

". . . [J]udgement against [the union] can in any event be had only for those damages that flowed from [its] own conduct. Assuming a wrongful discharge by the employer independent of any discriminatory conduct by the union and a subsequent discriminatory refusal by the union to process grievances based on the discharge, damages against the union for loss of employment are unrecoverable except to the extent that its refusal to handle the grievances added to the difficulty and expense of collecting from the employer." *Czosek v. O'Mara*, 397 U.S. 25, 29 (1970).

cliente suyo. Los abogados del Fondo le solicitaron una reunión para aclarar la situación. La reunión degeneró en un agravio del Presidente de la Hermandad a todos los abogados. Días después, éste solicitó formalmente al Fondo que cesara el descuento de cuotas a los abogados de adjudicaciones, por entender que éstos debían ser excluidos de la unidad apropiada. La Hermandad no informó estas gestiones a los recurridos ni les dio participación en los procedimientos. Tampoco respondió a los requerimientos de éstos al enterarse del laudo, para que se les restituyera a la unidad contratante. Debemos puntualizar que durante todo el historial de negociación colectiva en este caso los abogados llevaban a cabo las mismas tareas y desempeñaban las mismas funciones. Desde que se estipuló la unidad apropiada en el Acuerdo de Elección por Consentimiento, a que hicimos referencia al principio de esta opinión, hasta el día de hoy no ha habido variación alguna en las tareas que llevan a cabo los abogados del Fondo ni modificación en las funciones que razonablemente pudieran servir de fundamento a la Hermandad para solicitar la exclusión de ellos de la unidad contratante. Tal actuación arbitraria lesionó los intereses de los recurridos y constituye un quebrantamiento del deber de justa representación, que justificaba de por sí solo a la Junta el no poner en vigor el laudo. *F.S.E. v. J.R.T.*, supra, págs. 517–518.

Estamos, pues, ante un caso claro donde la Unión fue la que inició y causó que el patrono cometiese la violación al convenio. Sobre casos de esta naturaleza, en *Vaca v. Sipes*, supra, pág. 197, n. 18, se expresó lo siguiente:

> *We are not dealing here with situations where a union has affirmatively caused the employer to commit the alleged breach of contract.* In cases of that sort where the union's conduct is found to be an unfair labor practice, the NLRB has found an unfair labor practice by the employer, too, and *has held the union and the employer jointly and severally liable for any back pay found owing to the particular employee who was the subject of their joint discrimination.* (Énfasis suplido.)

En la parte III de la opinión concurrente del Juez White, en *Bowen v. United States Postal Service*, supra, pág. 242,

con la cual estuvieron conformes el Juez Presidente Rehnquist y los Jueces Marshall y Blackmun, se reconoció que la unión debería ser solidariamente responsable con el patrono por el pago del salario dejado de percibir cuando ésta fue la que indujo al patrono a cometer la violación del convenio.

En relación con este tipo de caso la Junta ha indicado:

"En casos de esa naturaleza [donde la unión es la que causa que el patrono viole el convenio] la Junta Nacional ha encontrado normalmente a la unión y al patrono incursos en prácticas ilícitas de trabajo y *los ha hecho responsables solidaria y mancomunadamente* por la paga atrasada que se le debe al empleado sujeto de la discriminación conjunta." (Énfasis suplido.) *Missy MFG*, D 727 (1976), Fernández, Demetrio, Romany, Celina, *Derecho Laboral Casos y Materiales*, T. II, Ed. de la U.P.R., 1987, pág. 1425.

■ Por considerar que esta norma fomenta los fines de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945 (29 L.P.R.A. sec. 61 y ss.), de lograr la paz industrial y disuadir tanto las actuaciones ilegales de las uniones contrarias a los intereses de sus representados, como las de los patronos, la adoptamos y resolvemos que en casos como el de autos, donde la Unión fue la que inició y causó que el patrono (F.S.E.) violase el convenio, tanto el patrono (F.S.E.) como la Unión serán frente al obrero solidaria y mancomunadamente responsables de los daños causados por la conducta combinada de ambos. Bajo estas circunstancias, una norma que eximiese de responsabilidad por los daños causados a una unión que induce al patrono a desafiliar a un grupo de obreros a quien se supone representa, tendría muy poco que hablar a su favor.

■ En cuanto a la proporción en que la Junta adjudicó la responsabilidad de ambos querellados, los hechos probados justifican la determinación que se hizo. *Rivera v. Junta Rel. Trabajo*, 70 D.P.R. 342, 353 (1949). En ausencia de arbitra-

riedad, caprichosidad, irrazonabilidad o prueba que demuestre que la Junta incurrió en un mal uso de su discreción, procede que confirmemos el dictamen. *Morales Torres v. J.R.T.*, supra; *Rivera v. Junta Relaciones del Trabajo*, 70 D.P.R. 5, 12–13 (1949); *Junta Rel. Trabajo v. Club Deportivo*, 84 D.P.R. 515, 525 (1962); *J.R.T. v. Línea Suprema, Inc.*, 89 D.P.R. 840, 845 (1964).

## II

*La Sec. 30(a) de la Ley de Salario Mínimo y el Fondo del Seguro del Estado*

La Sec. 30(a) de la Ley de Salario Mínimo de Puerto Rico, Ley Núm. 96 de 26 de junio de 1956, según enmendada, 29 L.P.R.A. sec. 246b(a), dispone lo siguiente:

> Todo obrero o empleado que por su trabajo reciba compensación inferior a la prescrita en las secs. 245 *et seq.* de este título o en un decreto mandatorio, orden o reglamento de la Junta de Salario Mínimo o en un convenio colectivo o en un contrato individual de trabajo tendrá derecho a cobrar mediante acción civil la diferencia adeudada hasta cubrir el importe total de la compensación que le corresponda, por concepto de salario, vacaciones, licencia por enfermedad o cualquier otro beneficio, *más una cantidad igual a la que se le haya dejado de satisfacer, por concepto de compensación adicional, además de las costas, gastos, intereses y honorarios de abogado del procedimiento*, estos últimos en suma razonable que nunca bajará de cincuenta (50) dólares, sin que para nada de ello obste pacto en contrario. (Énfasis suplido.)

Los recurrentes alegan que tienen derecho a los beneficios que surgen bajo esta sección. La Junta resolvió que no estaban cubiertos por la misma, ya que la propia Ley de Salario Mínimo de Puerto Rico excluye de su aplicación a las "personas empleadas . . . por el Gobierno del Estado Libre Asociado de Puerto Rico, con excepción de aquellas agencias o instrumentalidades de éste que operen como negocios o

empresas privadas".(5) Debemos, pues, determinar si el F.S.E. opera como negocio o empresa privada y por lo tanto está excluido de los beneficios de la Sec. 30(a) de la Ley de Salario Mínimo de Puerto Rico, *supra*.

A. *Agencia o instrumentalidad del Gobierno que opera como negocio o empresa privada*

En *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437, 455–456 (1976), al interpretar el Art. II, Sec. 18 de nuestra Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, identificamos algunos de los criterios a utilizar para determinar cuándo una agencia o instrumentalidad del Gobierno opera o funciona como negocio o empresa privada. Expresamente indicamos que ninguno de los criterios era determinante por sí solo, que examinaríamos en cada caso la conjunción de factores existentes. En *Unión Empleados Carreteras v. J.R.T.*, 119 D.P.R. 116 (1987), voto concurrente de la Juez Asociada Señora Naveira de Rodón, aplicamos estos criterios para determinar si, al amparo del Art. 2(11) de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 63(11), la Autoridad de Carreteras era una agencia del Gobierno que se dedicaba o podía dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario y, por lo tanto, era un patrono bajo dicha ley.

Hoy nos toca resolver si para propósitos de la Sec. 33(a)(2) de la Ley de Salario Mínimo de Puerto Rico, 29 L.P.R.A. sec. 246e(a)(2), el F.S.E. es una agencia o instrumentalidad que opera como negocio o empresa privada. Entre los factores a examinar están los siguientes:

. . . si los empleados de la agencia concernida están cubiertos por la Ley de Personal del Estado Libre Asociado; si

---

(5) Sec. 33(a)(2) de la Ley de Salario Mínimo de Puerto Rico, 29 L.P.R.A. sec. 246e(a)(2).

los servicios prestados por la agencia, por su naturaleza intrínseca, nunca han sido prestados por la empresa privada; si la agencia está capacitada para funcionar como una empresa o negocio privado; si la agencia de hecho funciona como una empresa o negocio privado; el grado de autonomía fiscal de que disfrute la agencia; el grado de autonomía administrativa de que goce; si se cobra o no un precio o tarifas por el servicio rendido (precio que debe ser básicamente equivalente al valor del servicio); si los poderes y facultades concedidos en la ley orgánica de la agencia la asemejan fundamentalmente a una empresa privada; y si la agencia tiene o no la capacidad para dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario . . . la estructura en sí de la entidad; la facultad de la agencia para demandar y ser demandada ilimitadamente; el poder de obtener fondos propios en el mercado general de valores a base de su récord económico y sin empeñar el crédito del Estado Libre Asociado; la facultad de adquirir y administrar propiedades sin la intervención del Estado; el punto hasta donde el reconocimiento a los trabajadores de la agencia de los derechos a [organizarse y negociar colectivamente, a la huelga, a establecer piquetes y a llevar a cabo otras actividades legales concertadas.] *A.A.A. v. Unión Empleados A.A.A.*, supra, pág. 455.

Para entender mejor el funcionamiento del F.S.E. comenzaremos nuestro análisis con una breve reseña de su trayectoria histórica. En 1935, para llevar a cabo la política pública relacionada con reclamaciones por accidentes laborales, la Ley Núm. 45 de 18 de abril de 1935 (11 L.P.R.A. sec. 1 *et seq.*), creó la Oficina del Administrador del F.S.E. en el Departamento de Hacienda y, como asegurador, al F.S.E.(6) En

---

(6) El Administrador de dicha oficina era nombrado por el Gobernador con el consejo y consentimiento del Senado. También se creó la Comisión Industrial de Puerto Rico (C.I.) en el Departamento del Trabajo con "funciones de naturaleza cuasi judicial y cuasi tutelar para la investigación y resolución de todos los casos de accidentes en los cuales el Administrador y el obrero o empleado lesionado, o sus beneficiarios, no llegasen a un acuerdo con respecto a la compensación . . .". Art. 6(a) de la Ley Núm. 45 de 18 de abril de 1935 (11 L.P.R.A. sec. 8(a)). Con respecto a las finanzas, disponía que, tanto la C.I. como el Administrador del

1957 la Oficina del Administrador del F.S.E. pasó a formar parte del Departamento del Trabajo. También se creó una junta consultiva para que ayudara al Secretario del Trabajo, "mediante consejo y recomendaciones, a establecer normas de seguridad industrial y protección para los trabajadores en los sitios de labor; y en el más amplio y efectivo desarrollo de programa de compensaciones y servicios para los obreros y empleados".(7) En 1969 la Ley Núm. 103 de 28 de junio creó, como organismos gubernamentales independientes, la actual Oficina del Administrador del F.S.E. y la Comisión Industrial (C.I.) con básicamente los mismos poderes y funciones que sus antecesoras. 1969 Leyes de Puerto Rico 294. Al F.S.E. se le encomendó establecer, organizar y administrar "sus propios sistemas y controles adecuados de personal, presupuesto, compras y contabilidad y cualesquiera otros sistemas administrativos necesarios para una operación eficiente y económica de los servicios".(8) En relación con el personal, éste quedó comprendido dentro del Servicio Exento.(9) Se facultó al F.S.E. a establecer un sistema de personal que debería "estar basado en el principio de mérito y en conformidad con las reglas y reglamentaciones que al

Fondo del Seguro del Estado (F.S.E.), tenían que someter su presupuesto a la Legislatura para aprobación. Las primas eran recaudadas por el Tesoro de Puerto Rico a través de los colectores de rentas internas y de aquellos funcionarios que el Tesoro autorizare e ingresaban en el Tesoro de Puerto Rico en el F.S.E. Art. 25 de la Ley Núm. 45, *supra*, 11 L.P.R.A. sec. 26. Los gastos incurridos por la C.I. y el Administrador del F.S.E. se cargaban al F.S.E. Art. 6 de la Ley Núm. 45, *supra*. El Administrador sólo podía invertir cualquier residuo o reserva con el permiso del Gobernador. Art. 29 de la Ley Núm. 45, *supra*, 11 L.P.R.A. sec. 30.

(7) Art. 6 de la Ley Núm. 94 de 22 de junio de 1957 (1957 Leyes de Puerto Rico 472, 502–503).

(8) Art. 6(a) de la Ley Núm. 103 de 28 de junio de 1969 (1969 Leyes de Puerto Rico 294, 295). En este artículo también se le concede poder al Administrador "para comprar, contratar o de otro modo proveer a la Agencia todos los materiales, suministros, equipo, piezas o servicios". Íd., pág. 295.

(9) El personal de la C.I. quedó comprendido dentro del Servicio sin Oposición.

efecto adop[taría] el Administrador" en consulta con la Unión de Empleados y Trabajadores de la agencia. 1969 Leyes de Puerto Rico 294, 297.

También mediante la Ley Núm. 103, *supra*, y a manera de excepción, se permitió a los empleados del F.S.E. unionarse y negociar colectivamente en relación con "salario, horas de trabajo y condiciones generales de empleo". Leyes de Puerto Rico, *supra*, pág. 300. Específicamente se confirió jurisdicción a la Junta sobre el F.S.E. y se creó un detallado esquema para el ejercicio del derecho a la negociación colectiva, haciendo un balance entre este derecho y la necesidad de que los servicios que ofrece el F.S.E. no se vean afectados. Como parte de este esquema, se requirió el arbitraje compulsorio y se prohibió la interrupción de los servicios al público.

El F.S.E. tiene a su cargo la implantación y el desarrollo de toda la política pública del Estado relacionada con las reclamaciones de empleados y de obreros por accidentes del trabajo. Su Administrador es nombrado por el Gobernador con el consejo y consentimiento del Senado por un término fijo de seis (6) años.[10] Para hacer viable esta vital función gubernamental se creó un organismo cuasi judicial, la C.I., que revisa las actuaciones del F.S.E. Marcando aún más la importancia de esta gestión gubernamental, está el hecho que las decisiones de la C.I. son revisables directamente por este Tribunal. No cabe duda que por su naturaleza, los servicios que ofrece y la gestión que realiza, el F.S.E. es una agencia gubernamental.

Aunque el F.S.E. fija y cobra primas de seguros, su presupuesto anual está sujeto a las limitaciones establecidas en el Art. 6 de la Ley Núm. 45, *supra*, según enmendado, 11

---

[10] Art. 6 de la Ley Núm. 45, *supra*, 11 L.P.R.A. sec. 8.

L.P.R.A. sec. 8,([11]) tiene que ser aprobado por el Gobernador y, una vez así aprobado, tendrá fuerza de ley. El F.S.E. sólo posee facultad para comprar o contratar "los materiales, suministros, equipo, piezas o servicios" (11 L.P.R.A. sec. 8) para llevar a cabo sus funciones pero, con excepción expresa del Hospital Industrial, carece de facultad para adquirir propiedades. Sólo con la recomendación del Secretario de Hacienda y la aprobación del Gobernador, y con las limitaciones establecidas en la propia ley, puede invertir cualquier residuo o reserva. Arts. 6 y 29 de la Ley Núm. 45, *supra*, y Art. 2 de la Ley Núm. 388 de 22 de abril de 1946, según enmendada.([12]) Tampoco puede obtener préstamos ni fondos de forma independiente del Estado.([13])

■ Con respecto a los empleados del F.S.E., según expresáramos anteriormente, la ley crea un detallado esquema

---

([11]) El Art. 6(a), en su parte pertinente, dispone:

"Las finanzas para la administración de este servicio estarán sujetas a las siguientes bases:

"La oficina del Administrador del Fondo del Estado prestará los servicios que le son encomendados por este Capítulo con arreglo a su propio presupuesto anual, el cual, una vez haya sido aprobado por el Gobernador de Puerto Rico, a propuesta del Administrador, tendrá fuerza de ley. Disponiéndose, que dicho presupuesto deberá incluir las asignaciones o partidas necesarias para cumplimentar los acuerdos del convenio colectivo otorgado por el Administrador con el representante autorizado de los empleados y trabajadores del Fondo del Seguro del Estado. El Fondo del Seguro del Estado deberá separar los fondos necesarios para el pago de los servicios que le preste la Administración de Servicios Médicos de Puerto Rico al hospital del Fondo, ubicado en los terrenos de la Administración. La cantidad reservada para el anterior propósito no podrá utilizarse para otro fin que el aquí dispuesto. El criterio a utilizarse para reservar dichos fondos se determinará por la Administración, en coordinación con el Fondo del Seguro del Estado; tomando como base la experiencia de años anteriores, el volumen de servicios proyectados, costos, inflación y cualquier otro factor que resulte necesario. De resultar algún sobrante de los referidos fondos, el mismo será acreditado en el presupuesto correspondiente al próximo año fiscal. Por el contrario, en caso de que se gaste una cantidad mayor a la presupuestada la misma se incluirá en el presupuesto del próximo año fiscal." 11 L.P.R.A. sec. 8(a).

([12]) 11 L.P.R.A. secs. 8, 30 y 101.

([13]) 11 L.P.R.A. sec. 30.

fundado en el principio de mérito, que reconoce el derecho a unionarse y negociar colectivamente, pero no así el derecho a huelga.([14])

■ Finalmente encontramos que el F.S.E. carece de personalidad jurídica separada del Estado Libre Asociado de Puerto Rico y no puede demandar ni ser demandado, excepto en las instancias limitadas de los casos relacionados con las reclamaciones por accidentes del trabajo comenzados en el F.S.E., la subrogación en cuanto a terceros en este mismo tipo de casos([15]) y las comparecencias ante la Junta.

Tomando en conjunto todos los factores antes enunciados y haciendo un balance racional entre los que denotan una gestión puramente gubernamental y los que reflejan una actividad de tipo privada, resolvemos que el F.S.E. no opera o funciona como negocio o empresa privada.

## B. *Daños líquidos*

■ La Junta denegó los daños líquidos que provee la Sec. 30(a) de la Ley de Salario Mínimo de Puerto Rico, *supra*, por entender que según la Sec. 33(a)(2) de esta ley, *supra*, el F.S.E. quedaba excluido. Habiendo determinado que el F.S.E. no funciona como negocio o empresa privada y que, por ende, éste forma parte integral de la Rama Ejecutiva del Estado Libre Asociado de Puerto Rico, sin personalidad jurídica propia, concluimos que la Junta actuó correctamente al denegar los daños líquidos de la Sec. 30(a), *supra*.

## C. *Intereses*

La Junta también denegó los intereses solicitados tanto desde "la violación del salario convenido", como desde la no-

---

([14]) 11 L.P.R.A. sec. 8.
([15]) 11 L.P.R.A. sec. 32.

tificación a los querellantes de las cantidades líquidas a que son acreedores. Se fundó en la no aplicación de la Sec. 30(a) de la Ley de Salario Mínimo de Puerto Rico, *supra*. También se negó a aplicar el caso de *Pan American v. Tribunal Superior*, 100 D.P.R. 413 (1972), por entender que "[e]n ningún momento [el Tribunal Supremo] expresó que en casos bajo la Ley de Salario Mínimo ... el cómputo podría hacerse como lo determinó el tribunal inferior en [dicho caso]". Anejo IV, pág. 150.

Por las razones expresadas anteriormente, la Junta actuó correctamente al no conceder los intereses que provee la Sec. 30(a) de la Ley de Salario Mínimo de Puerto Rico, *supra*.

Pasemos ahora a considerar si procede la imposición de intereses desde la notificación a los querellantes de las cantidades líquidas a que eran acreedores. En *Municipio de Mayagüez v. Rivera*, 113 D.P.R. 467, 472 (1982), indicamos que:

> [A]quel empleado que es injustamente despedido y cuya reposición se ordena con el pago de salarios dejados de percibir tiene el derecho de recibir el pago de intereses al tipo legal sobre la cuantía de lo adeudado, que serán computados desde la fecha de la decisión que emita la Junta de Apelaciones del Sistema de Administración de Personal.

En *Colón Molinary v. A.A.A.*, 103 D.P.R. 143, 160–161 (1974), equiparamos un laudo arbitral a una adjudicación judicial y dijimos que la "[c]onsecuencia lógica e inexorable al trazar rumbos paralelos entre un laudo arbitral y un dictamen judicial es el reconocer que proceden intereses legales ... computados a partir de la fecha del laudo ...". (Énfasis suprimido.) En *Municipio de Mayagüez v. Rivera*, supra, págs. 469–470, lo citamos con aprobación y expresamos que habíamos "notado cierta inconsistencia en los dictámenes de

los tribunales de instancia en lo referente a la imposición del interés al tipo legal sobre la cuantía de la sentencia dictada en casos en que se ha condenado al Estado Libre Asociado de Puerto Rico y/o sus municipios, agencias e instrumentalidades al pago de una suma de dinero". Recientemente, en *Morales Torres v. J.R.T.*, supra, pág. 300, resaltamos nuevamente que "[l]a norma establecida jurisprudencialmente es que la imposición de intereses legales se computa a partir de la fecha de la orden, laudo o decisión". Reiteramos, pues, que estos intereses forman parte integral de la sentencia dictada y que pueden ser recobrados aun cuando no se mencionen en la misma, que proceden como cuestión de ley en los casos en que el Estado es parte y que "no son contrarios a las leyes de inmunidad gubernamental".

Concluimos, por lo tanto, que la Junta incidió al no conceder intereses desde la notificación a los querellantes de las cantidades líquidas a que eran acreedores.

## D. *Honorarios de abogado*

▮ Los querellantes fundamentan su solicitud para honorarios de abogado en la Sec. 30(a) de la Ley de Salario Mínimo de Puerto Rico, *supra*; la Ley Núm. 402 de 12 de mayo de 1950, conocida como Ley para Regular la Concesión de Honorarios de Abogado, 32 L.P.R.A. secs. 3114–3117; la Ley Núm. 379 de 15 de mayo de 1948, conocida como Ley sobre Horas Extras, 29 L.P.R.A. secs. 271–288; el caso de *Vaca v. Sipes*, supra, y los casos de *Colón Molinary v. A.A.A.*, supra, y *J.R.T. v. Caribbean Towers, Inc.*, 102 D.P.R. 774 (1974).

Ya hemos concluido que la Sec. 30(a) de la Ley de Salario Mínimo de Puerto Rico, *supra*, no aplica al F.S.E. Tampoco le son aplicables las disposiciones de la Ley Núm. 402, *su-*

*pra,*(¹⁶) ni las disposiciones de la Ley Núm. 379, *supra,*(¹⁷) ya que el Estado está excluido de ambas.

En *Colón Molinary v. A.A.A.,* supra, pág. 159, expresamos que "la política pública que inspira la legislación sobre honorarios de abogado y nuestras decisiones al efecto equiparando un laudo arbitral a una adjudicación judicial, nos llevan a concluir, que de ordinario, procede la imposición de honorarios en casos en que el obrero tiene que acudir al foro sustitutivo del judicial a hacer valer sus derechos". (Escolio omitido.)

Ahora bien, también hemos resuelto que como doctrina general el Estado y sus funcionarios no están sujetos al pago de honorarios de abogado. *De León v. Sria. de Instrucción,* 116 D.P.R. 687, 688 (1985); *Rodríguez Cancel v. A.E.E.,* 116 D.P.R. 443, 459–460 (1985); *Colondres Vélez v. Bayrón Vélez,* 114 D.P.R. 833 (1983); Regla 44.3(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III. Ya que no hay disposición expresa que autorice la imposición de honorarios de abogado contra el F.S.E., éstos no procedían. *Catalytic Ind. Maint. Co. v. F.S.E.,* 121 D.P.R. 98 (1988). El error señalado no se cometió.

Además, cabe señalar que en *Morales Torres v. J.R.T.,* supra, pág. 299, acogimos el enfoque de la Junta que

---

(¹⁶) El Art. 2 de la Ley Núm. 402 de 12 de mayo de 1950 (32 L.P.R.A. sec. 3115) específicamente dispone, en lo que respecta al Estado, que la palabra "patrono" sólo "incluirá a las autoridades y corporaciones públicas del Gobierno Estadual y/o sus representantes".

(¹⁷) El Art. 16 de la Ley Núm. 379 de 15 de mayo de 1948 (29 L.P.R.A. sec. 285) en su parte pertinente dispone:

"No se aplicarán disposiciones de las secs. 271 a 288 de este título a los empleados del Gobierno Estatal, de los Gobiernos Municipales, ni del Gobierno de la Capital ni a los de las agencias o instrumentalidades de dichos gobiernos, con excepción de aquellas agencias o instrumentalidades que se dediquen a empresas agrícolas, industriales, comerciales o de servicio público."

"'no impon[dría] honorarios a favor de un abogado privado de una parte querellante por servicios dados a tal "parte" en [la Junta], toda vez que la representación la ostenta la División Legal de la Junta, la cual a su vez representa el interés público'".

## E. *Daños y angustias*

Hemos reconocido la facultad de la Junta para "ordenar que una parte compense a la otra los daños causádoles . . . siempre y cuando la Junta entienda que ese remedio es necesario y apropiado para efectuar los propósitos de la ley". *U.T.I.E.R. v. J.R.T.*, 99 D.P.R. 512, 533 (1970). También hemos establecido que, de ordinario, cuando la Junta considere la imposición de daños y angustias, y determine que su imposición no es ni necesaria ni apropiada, no sustituiremos nuestro criterio por el del foro administrativo. *U.T.I.E.R. v. J.R.T.*, supra, pág. 533; *Morales Torres v. J.R.T.*, supra.

En el caso de autos la Junta expresa que la concesión de los daños y angustias mentales no es necesaria y apropiada para efectuar los propósitos de la ley, debido a que se trata de unas diferencias salariales que los abogados querellantes dejaron de percibir como gerenciales. No podemos estar de acuerdo. La evidencia en el récord es abundante en cuanto a los ataques emocionales a los cuales estuvieron sujetos los querellantes. No se trata de unas meras diferencias salariales, sino de un intento de la Unión por desafiliar a los querellantes de unas prácticas ilícitas iniciadas por ésta, que tuvieron su impacto negativo sobre los querellantes, creando desasosiego entre estos trabajadores y, por lo tanto, en su unidad de trabajo.

En este caso los intereses privados de los querellantes coinciden con los intereses públicos contenidos en el estatuto que crea la Junta: lograr la paz industrial y producción inin-

terrumpida de servicios, y eliminar en lo posible las disputas obreras fomentando la negociación colectiva, entre otros. Conceder daños y angustias mentales como remedio tendría el efecto de disuadir prácticas ilícitas de este tipo en el campo de las relaciones obrero-patronales. Ante las circunstancias específicas de este caso entendemos que procedía la concesión de daños y angustias mentales. El error señalado se cometió.

Por todo lo antes expuesto, *se dictará sentencia modificatoria de la decisión y orden de la Junta, de acuerdo con lo aquí resuelto, y se devuelve el caso a la Junta para que continúen los procedimientos a tenor con lo dispuesto en esta opinión.*

El Juez Presidente Señor Pons Núñez disiente de la Parte E de la opinión. Los Jueces Asociados Señores Negrón García y Rebollo López no intervinieron.

