# 2008 DTA 74

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL III**

JUAN G. GARCÍA NATAL (#31091)
Recurrente

v.

POLICÍA DE PUERTO RICO
Recurrida

Núm. KLRA-07-00174

San Juan, Puerto Rico, a 14 de mayo de 2008

Panel integrado por su Presidenta, la Juez Bajandas Vélez,
y los Jueces Aponte Hernández y Morales Rodríguez

Aponte Hernández, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA ENMENDADA

El 31 de octubre de 2007 emitimos sentencia [1] mediante la cual revocamos la resolución de la Comisión de Investigación, Procesamiento y Apelación, que confirmó la determinación de la Policía de Puerto Rico de expulsar de dicho cuerpo al agente Juan G. García Natal.

Oportunamente, la Policía de Puerto Rico presentó Moción en Solicitud de Reconsideración. Luego de examinar minuciosamente los autos en atención a los señalamientos de la solicitud de reconsideración, procede que enmendemos nuestra sentencia original a los fines de clarificar su contenido. No obstante, reafirmamos nuestro dictamen en cuanto a revocar la resolución de la Comisión de Investigación, Procesamiento y Apelación. Veamos.

El recurrente, señor Juan García Natal, nos solicita que revoquemos la Resolución emitida el 17 de agosto de 2006 por la Comisión de Investigación, Procesamiento y Apelación (CIPA). Mediante la misma, el foro administrativo confirmó la determinación del Superintendente de la Policía de Puerto Rico de expulsar al recurrente de dicho cuerpo.

**Por los fundamentos que expondremos, se revoca la resolución recurrida.**

### I

Surge de la transcripción de la vista administrativa que los hechos que dan lugar al presente recurso son los siguientes:

La Policía de Puerto Rico realizó una investigación administrativa debido a unos incidentes ocurridos el 24 de noviembre de 2003, en los cuales se alegó que unos agentes de la Policía intervinieron, alegadamente de manera impropia, con una fémina que se encontraba detenida en una celda del Cuartel del Precinto 166 de San Juan. [2]

De la investigación realizada por la Policía, surge que la referida joven fue ingresada en la mencionada celda por aparente posesión de sustancias controladas y se encontraba bajo la custodia de la retén de turno, la Agente Yahaira Cintrón Ocasio. Dicha Agente declaró que poco después que la joven fue ingresada, ésta comenzó a emitir unos sonidos con la boca que a ella le parecieron eróticos o de índole sexual. Dichos sonidos causaron que se congregaran alrededor de la celda los Agentes Ángel Nieves González, Luis Cardona Delgado, Juan Quiñones Ríos, José Gómez González y el sargento Juan Fontánez Vicente. **La Agente Cintrón Ocasio declaró que el también Agente Juan García Natal no se encontraba entre los agentes congregados cerca de la celda en esos momentos.**

Acto seguido a estos sonidos, la joven comenzó a desnudarse y a mostrar sus partes íntimas a todos los allí presentes. Su desnudez se extendió al punto de que mostró a todos sus senos, glúteos, y vagina. La Agente Cintrón Ocasio declaró que, al sentirse incómoda con la situación, se comunicó vía telefónica con el Sargento

José V. Rivera Rivera y le explicó lo que estaba sucediendo. Ni la Agente Cintrón Ocasio, ni el Sargento Fontánez, ni alguno de los otros agentes intentó impedir que la joven continuara con su conducta impropia.

Una vez el Sargento Rivera Rivera llegó al Cuartel, ordenó que los agentes se alejaran de la celda, logrando que éstos se dispersaran brevemente. Sin embargo, al éste marcharse del Cuartel, los agentes se aglutinaron nuevamente frente a la celda donde se encontraba la mencionada joven. La Agente Cintrón Ocasio declaró que en ese momento le requirió a sus compañeros que se alejaran de la celda, pero que su pedido no fue respetado. Más tarde, encontrándose en el área del retén, les requirió nuevamente sin éxito que se movieran del área. En esta ocasión observó por primera vez que se encontraba presente el Agente José Gómez González.

El Agente Gómez González había sido ordenado por el Sargento Fontánez a que consiguiera un rotén. Éste acudió al sótano del cuartel, donde le solicitó al Agente Medina Ríos que le prestara su rotén, ya que el Sargento Fontánez le había pedido uno. Al regresar donde el Sargento Fontánez con el rotén, el Agente Gómez se lo entregó al sargento y procedió a marcharse del cuartel. En algún momento, de alguna manera, la joven entró en posesión del rotén, entró al baño de la celda con el rotén y, según la Agente Cintrón Ocasio, comenzó a emitir sonidos eróticos en voz muy alta. Más tarde, la joven le declaró a la Agente Cintrón Ocasio que el Sargento Fontánez le había prometido que la sacaría de la cárcel si ella se introducía el rotén en su vagina.

La Agente Cintrón Ocasio también narró que posteriormente la joven salió del baño y comenzó a fumarse un cigarrillo a la misma vez que continuaba desnudándose. En ese momento, las Agentes Loren Vega y Luz Manzano Mercado pasaron por la celda y le llevaron un vaso de agua, ya que la joven había manifestado que tenía sed. Acto seguido, la joven comenzó a lanzar el agua contra los agentes que se la habían ofrecido e incluso les lanzó agua del inodoro de la celda. Debido al agua que había en el piso, la joven comenzó a resbalarse y a darse contra las paredes de la celda.

Por tal razón, las mencionadas agentes buscaron las llaves de la celda para entrar, vestir a la joven, y tratar calmarla. No obstante, la joven se mostró agresiva, forcejeando con las agentes e intentando morderlas. Aun luego de ser esposada, la joven continuó resistiendo los intentos de las agentes de calmarla. **Según declaró la Agente Cintrón Ocasio, en esos momentos llegó el recurrente, Agente García Natal, y roció gas pimienta ("pepper spray") dentro de la celda. Las Agentes Vega y Manzano Mercado lograron entonces sacar a la joven de la celda para que ésta fuese atendida por los paramédicos.**

El paramédico informó que la menor aparentaba estar intoxicada con sustancias químicas, y ordenó que la joven recibiera un baño para aliviarle los efectos del gas pimienta.

Esa noche, la joven fue ingresada en la cárcel de mujeres de Vega Alta, luego de que se determinara causa probable para arresto por posesión de sustancias controladas y ésta no pudiera prestar la fianza fijada.

A raíz de esos hechos, la Policía de Puerto Rico realizó una investigación administrativa relacionada con la conducta de varios de los agentes involucrados en el incidente. Como resultado de la referida investigación, el 6 de abril de 2004, el Superintendente de la Policía suscribió la comunicación sobre intención de expulsión (Resolución de Cargos) que le fue notificada al Agente García Natal. [3] En la misma se indicó que de la investigación había surgido que la actitud asumida con relación a la joven detenida había sido inmoral y antiética. Ello, al solicitarle o permitirle que realizara un *"espectáculo sexual"* y le mostrara las partes íntimas del cuerpo a los presentes. Además, que el Agente García Natal *"permitió que un compañero le proveyera a la menor un roten de fiberglass para que se lo introdujera por la vagina, le permitió que fumara en la celda, y le roció gas pimienta a la detenida en el estado de indefensión en que se encontraba."*

Se indicó, además, que con la referida actitud, el Agente García Natal ponía de manifiesto un total menosprecio a la sensibilidad y dignidad humana. Y, con ello, una crasa incompatibilidad con sus deberes y

responsabilidades como agente del orden público. También se consignó que *"[l]os hechos antes reseñados constituyen una violación al Artículo 14, Sección 14.5, Faltas Graves Números 1, 14, y 27, 40 (d), (i), y Falta Leve Número 27 del Reglamento de Personal de la Policía de Puerto Rico, en concordancia con lo establecido en la Orden Especial Núm. 2003-08, Sobre Política Pública en cuanto a la Protección a los Derechos Civiles y Orden General 98-11, Normas y Procedimientos para el Manejo de Personas bajo Custodia en las Celdas de los Cuarteles y Dependencias de la Policía de Puerto Rico, Sección E.3.1, N, Ñ, y Disposiciones Generales I.1, y Reglamento de Ética Gubernamental Art. 6(b) y (e)"*.

El recurrente solicitó la vista administrativa a la cual tenía derecho y la misma fue celebrada el 21 de octubre de 2004.

Finalmente, el 10 de mayo de 2005, el Superintendente de la Policía de Puerto Rico firmó la carta de *"EXPULSIÓN"* del Agente García Natal. **[4]**

Por no estar de acuerdo con la decisión del Superintendente, el Agente García Natal apeló la misma ante la CIPA el 29 de junio de 2005. Celebrada la vista administrativa, la cual se extendió durante los días 14 de marzo, 4 de abril, y 17 de agosto de 2006, dicho organismo apelativo confirmó la expulsión del recurrente.

Inconforme, el Agente García Natal recurre ante este Tribunal y plantea los siguientes errores:

*"Erró la Comisión al apreciar la prueba tomada en su totalidad según consta en el récord.*

*Erró la Comisión al no sostener que la prueba era insuficiente en derecho para encontrar al recurrente incurso en responsabilidad por las faltas graves señaladas.*

*Erró la Comisión al determinar que la expulsión del recurrente se ajustó a derecho.*

*Erró la Comisión al no modificar la sanción impuesta al recurrente por una menor, al hacer un análisis total de la prueba presentada y las circunstancias en que se desarrollaron los hechos."*

Con el beneficio de los alegatos del recurrente y del Procurador General, y la transcripción de la prueba de la vista administrativa, pasamos a resolver.

## II

Las decisiones de los organismos administrativos merecen una gran consideración y deferencia por parte de los tribunales, en vista de la experiencia y conocimiento especializado que poseen. *Rivera v. A & C Development Corp.*, 144 D.P.R. 450 (1997); *Agosto Serrano v. F.S.E.*, 132 D.P.R. 866 (1993). A tono con lo anterior, el ámbito de nuestra intervención se delimita por la sección 4.5 de la Ley de Procedimiento Administrativo Uniforme (LPAU), 3 L.P.R.A. sec. 2175, que establece en lo pertinente:

*"Las determinaciones de hechos de las decisiones administrativas serán sostenidas por el tribunal si se basan en evidencia sustancial que obre en el expediente administrativo. Las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal."*

Sabido es que la revisión judicial de las decisiones administrativas comprende tres aspectos: (1) la concesión del remedio apropiado, (2) la revisión de las determinaciones de hechos conforme al criterio de evidencia sustancial, y (3) la revisión de las conclusiones de derecho en todos sus aspectos. *Reyes Salcedo v. Policía de P.R.*, 143 D.P.R. 85, 93 (1997). La evidencia sustancial se define como aquella relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70, 75 (2000); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64 (1998); *Hilton Hotels v. Junta*

*Salario Mínimo*, 74 D.P.R. 670 (1953). El propósito de la regla de evidencia sustancial aplicable a las determinaciones de hechos es evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor. *P.C.M.E. v. J.C.A.*, 166 D.P.R. ____ (2005), **2006 J.T.S. 7**; *Reyes Salcedo v. Policía de P.R., supra.*

A diferencia de las determinaciones de hechos, las conclusiones de derecho de la agencia pueden ser revisadas en todos sus aspectos por el tribunal. 3 L.P.R.A. sec. 2175. Esto no significa que los tribunales puedan descartar liberalmente las conclusiones de derecho de una agencia administrativa. *P.R.T.C v. J. Reg. Tel. de P. R.*, 151 D.P.R. 269 (2000). Por el contrario, los tribunales deben brindar deferencia a las interpretaciones que las agencias administrativas efectúan con relación a la ley cuya administración le fue encomendada por la legislatura, ya que en esos casos se presume que la agencia posee un conocimiento especializado en aquellos asuntos que le fueron encomendados. *Reyes Salcedo v. Policía de P.R., supra.* Ha expresado nuestro Tribunal Supremo que dicha deferencia descansa en que los organismos administrativos *"cuentan con una basta experiencia y conocimiento (expertise) en relación con la materia con la que bregan día tras día"*. *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.,* 144 D.P.R. 425, 436 (1997); *M & V Orthodontics v. Negdo. Seg. Empleo*, 115 D.P.R. 183 (1984).

A la luz de estos preceptos, nuestro Tribunal Supremo ha establecido que la revisión judicial está limitada a determinar si la actuación administrativa fue razonable y cónsona con el propósito legislativo, o si, por el contrario, fue irrazonable, ilegal o medió abuso de discreción. *Rivera Concepción v. A.R.P.E.,* 152 D.P.R. 116 (2000); *Fuertes y otros v. A.R.P.E.,* 134 D.P.R. 947 (1993). De ahí que este tribunal se limitará a indagar sobre la razonabilidad de la decisión del foro administrativo sin sustituirla por su propio criterio, salvo que se infrinjan valores constitucionales fundamentales o se trate de actuaciones claramente arbitrarias. *Rivera Concepción v. A.R.P.E., supra; Fac. C. Soc. Aplicadas, Inc. v. C.E.S.,* 133 D.P.R. 521 (1993). De existir más de una interpretación razonable de los hechos, los tribunales, de ordinario, deben sostener la selección de la agencia. *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra.* Esto es así, porque las determinaciones de hechos de una agencia no pueden modificarse si existe una base racional en la prueba para las mismas. *López v. Junta Planificación,* 80 D.P.R. 646 (1958).

El criterio a aplicarse no es si la decisión administrativa es la única razonable, la más razonable o la mejor al arbitrio del foro judicial; es si la determinación administrativa, en interpretación de los reglamentos y las leyes que le incumbe implementar, es una razonable. *Martínez v. Rosado,* 165 D.P.R. ____ (2005), **2005 J.T.S. 132**; *Rivera Concepción v. A.R.P.E., supra; De Jesús v. Depto. Servicios Sociales,* 123 D.P.R. 407 (1989).

Cónsono con el principio de deferencia, existe una presunción de regularidad y corrección a favor de las decisiones administrativas, *Rivera Concepción v. A.R.P.E., supra; Catalytic Ind. Maint. Co. v. F.S.E.,* 121 D.P. R. 98 (1988). Por tanto, para que un tribunal pueda decidir que la evidencia en el expediente administrativo no es sustancial, es necesario que la parte afectada demuestre que existe otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la prueba presentada, y hasta el punto que se demuestre claramente que la decisión del organismo administrativo no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración. *P.C.M.E. v. J.C.A., supra; Domínguez v. Caguas Expressway Motors,* 148 D.P.R. 387 (1999); *Misión Ind. P.R. v. J.P., supra.* Exigir tal demostración inicial tiene el propósito de evitar que la parte afectada impugne las determinaciones de hechos con meras alegaciones. *Ramírez v. Depto. de Salud,* 147 D.P.R. 901 (1999). Si en la solicitud de revisión la parte afectada no demuestra la existencia de esa otra prueba, las determinaciones de hechos de la agencia deben ser sostenidas por el tribunal revisor. *Domínguez v. Caguas Expressway Motors, supra; Ramírez v. Depto. de Salud, supra.*

No obstante, la deferencia reconocida no equivale a la renuncia de la función revisora del tribunal en instancias apropiadas y meritorias, como resulta ser cuando el organismo administrativo ha errado en la

aplicación de la ley. *Reyes Salcedo v. Policía de P.R., supra; Rodríguez v. Comisión Industrial*, 99 D.P.R. 368 (1970). Es nuestra obligación respetar la apreciación de la agencia en cuanto a la credibilidad de testigos. *Hilton Hotels v. Junta Salario Mínimo, supra.* No debemos perder de vista que la determinación en cuanto al testimonio y la deducción de hechos establecidos en la vista le corresponde al organismo adjudicador, por lo que este tribunal no debe pasar sobre la credibilidad del testigo o repesar la evidencia, sino que se limitará a tomar el récord en su totalidad, para determinar si contiene evidencia sustancial que sostenga las conclusiones de la agencia. *J.R.T. v. Línea Suprema, Inc.*, 89 D.P.R. 840 (1964). Las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto, y la revisión judicial se limita a determinar si la agencia actuó arbitraria, caprichosa, irrazonablemente o si abusó de su discreción. *Morales González v. J.R.T.*, 121 D.P.R. 249 (1988).

### III

Por estar íntimamente relacionados, discutiremos en conjunto los errores señalados por el recurrente. De acuerdo con dichos planteamientos, lo que debe determinar este Tribunal es si, conforme a la prueba presentada en la vista administrativa, la CIPA actuó correctamente al confirmar la determinación del Superintendente de la Policía de expulsar de su puesto al Agente García Natal o si, en contrario, abusó de su discreción, y actuó arbitraria, caprichosa e irrazonablemente. Veamos.

Las imputaciones que el Superintendente le formuló al Agente García Natal, en la Resolución de Cargos de 6 de abril de 2004, fueron las siguientes:

*"Usted asumió una actitud antiética e inmoral con la detenida, al solicitarle o permitirle que realizara un **espectáculo sexual** y mostrara las partes íntimas del cuerpo, además permitió que un compañero le proveyera de un rotén de fiberglass para que se introdujera por la vagina, le permitió fumar en la celda y usted le roció gas pimienta a la detenida en el estado de indefensión en que se encontraba, lo que constituye una violación a Ley."* (Énfasis nuestro)

No obstante, todos los testigos presentados por el Superintendente en la vista ante la CIPA declararon, de forma unánime, que el Agente García Natal no estuvo presente ni participó del llamado *"espectáculo sexual"* que el Superintendente caracteriza en la Resolución de Cargos. La única prueba en cuanto al Agente García Natal fue que cuando varias agentes trataban de controlar a la detenida, éste le arrojó gas pimienta.

También, el Procurador General reconoció en su Escrito en Cumplimiento de Orden la limitada participación del recurrente en los deplorables hechos anteriormente relatados. Éste expresó:

*"De entrada, debemos señalar que la prueba desfilada por la Policía de Puerto Rico ante la CIPA no se dirigió a sostener que el recurrente participó de los bochornosos actos ocurridos frente a la celda donde se encontraba ingresada la menor A.D.M.L., en los que un grupo de agentes incitó a la referida joven a realizar actos indecorosos e inapropiados. **Reconocemos que el señor García Natal no participó de esos eventos. El acto incurrido por el recurrente fue posterior a tal suceso y consistió en rociar innecesaria e injustificadamente con gas pimienta a la joven** detenida dentro de la celda, aun cuando ya la misma estaba esposada, lo cual constituyó un claro e indudable abuso de autoridad."* (Énfasis original) [5]

En la vista ante la CIPA declararon dos testigos que mencionaron la participación del Agente García Natal en los hechos de 24 de noviembre de 2003. Una de estas testigos fue la Agente Cintrón Ocasio. Su testimonio fue preciso en cuanto a que el Agente García Natal no estaba presente entre los agentes que rodearon la celda en la cual estaba ingresada la menor, y que no tuvo participación alguna en la conducta indecente de la menor ni de los otros agentes. El testimonio de la Agente Cintrón Ocasio menciona al Agente García Natal por primera vez cuando describe los intentos de las agentes de vestir y tranquilizar a la menor. Según la Agente Cintrón Ocasio, dos agentes, ambas en estado de preñez, entraron a la celda de la menor para tranquilizarla, ya que ésta se estaba

golpeando contra las paredes de la celda. **La menor estaba fuera de control y forcejeó con las agentes e intentó morderlas.** Aunque finalmente las agentes lograron esposarla, la menor continuó ofreciendo resistencia. En ese momento, según la Agente Cintrón Ocasio, el Agente García Natal entró a la celda y roció a la menor con gas pimienta. Luego de dicha actuación, las agentes por fin lograron controlar a la joven, aunque ésta se vio afectada por los efectos del gas.

En esos mismos términos declaró la también agente y testigo de cargo Edith Miranda Berdecía. Examinado íntegramente, dicho testimonio corrobora el anterior en cuanto a que la menor pudo ser controlada, sólo después que el Agente García Natal le roció el gas pimienta. A preguntas de uno de los Comisionados de la CIPA, la Agente Edith Miranda Berdecía declaró: [6]

*"P. En cuanto a la cuestión del gas pimienta, cuándo lanza el gas pimienta el agente...*

*R. Ajá.*

*P. ¿Cuántos...cuántas agentes...cuántas damas estaban dentro de la celda?*

*R. Habían tres agentes y la detenida, habían cuatro personas dentro de la celda.*

*P. Y en ese momento es que se lanza el...*

*R. Sí, señor*

*P. ...el gas pimienta. ¿Usted entiende que esas agentes podían controlar a la...*

*R. A la detenida.*

*P. ...a la detenida sin necesidad del gas pimienta?*

*R. Yo entiendo sí."*

Luego, en el contrainterrogatorio del Lcdo. José Valle Brenes, abogado del Agte. García Natal, la Agte. Miranda Berdecía también declaró: [7]

*"P. El Presidente le hizo una pregunta a usted...*

*TESTIGO:*

*Sí, señor.*

*...y usted dice que creía que sus compañeras pudieron haber controlado a la muchacha.*

*R. Sí, eso dije.*

*P. Pero en el momento que lanzan el "pepper spray", entiendo que se le lanzó a la cara a la muchacha, no a las compañeras.*

*R. Bueno, quien se vio afectada fue la detenida y...*

*P. En ese momento que llega García Natal...*

R.  Sí.

P.  ...diga si es o no cierto que la detenida estaba forcejeando con las compañeras de usted.

R.  Sí, señor.

P.  Y ella, inclusive, estaba mordiendo.

R. Sí, señor.

Okay. Y ahí es que García Natal en esos precisos momentos es que le lanza a ella el "pepper spray".

R.  Sí, señor.

P.  Después de eso fue que las compañeras suyas pudieron controlar y neutralizar a la muchacha, a la detenida.

R.  Entiendo que sí.

P.  ¿Usted lo vio?

R.  Bueno, sí.

LCDO. VALLE:

Gracias."

Un examen de la Resolución emitida por la CIPA evidencia, según se expresa en la misma, que *"[d]e la prueba aportada que fuera admitida y creída"* solamente se formuló la siguiente determinación de hechos en cuanto al Agente García Natal:

**"En un momento dado, la detenida se violentó y el agente García Natal arrojó gas pimienta a la celda y dos mujeres policía la sacaron de allí para ser atendida por paramédicos. La joven fue esposada antes de recibir atención médica." [8]**

Como señaláramos, la anterior es la **única determinación de hecho formulada en la Resolución de la CIPA en cuanto a la participación del recurrente en el incidente con la menor detenida.** Ello hace evidente que lo imputado al recurrente por la Policía se apartó abismalmente de lo que fue su participación en los hechos génesis de la controversia que nos ocupa.

Sin embargo, más adelante en dicha Resolución, en el último párrafo de las Conclusiones de Derecho formuladas por la CIPA, se hace referencia a la limitada participación del recurrente pero, contradictoriamente, a la misma vez se le trata de implicar en los hechos en los cuales no participó. Se señala, textualmente:

*"La prueba desfilada en este caso ubica a los co-apelantes, proveyendo los medios que propiciaron un espectáculo inmoral y detrimental a la imagen del Cuerpo que representa. **El co-apelante García Natal le arrojó un gas tóxico a la detenida sin justificación incurriendo en abuso de autoridad. Con el agravante de que el evento se desarrolló en un precinto policíaco.** Damos crédito total a la prueba aportada por la autoridad nominadora. La misma demostró de manera fehaciente que los co-apelantes cooperaron activamente en la configuración de un acto denigrante y contrario a la dignidad de una persona detenida en contravención*

*con sus deberes oficiales. **Esta conducta enmarca en las Faltas Graves 1 y 27 del Reglamento.** Era además deber de los co-apelantes desalentar en sus compañeros la conducta aquí denunciada como agentes del orden."* (Énfasis nuestro)

Fundamentada en las anteriores determinaciones, la CIPA encontró al recurrente incurso en las Faltas Graves 1 y 27 del Reglamento de Personal de la Policía de Puerto Rico, **[9]** y confirmó su expulsión de dicho cuerpo. El Reglamento define dichas faltas como sigue:

*"Sección 14.5-Identificación de Faltas*

*FALTA GRAVE #1:*

*Demostrar incapacidad manifiesta, ineptitud, descuido, parcialidad o negligencia en el desempeño de sus deberes, funciones y responsabilidades.*

*FALTA GRAVE #27:*

*Observar una conducta lesiva, inmoral o desordenada en detrimento del Cuerpo de la Policía".*

No podemos avalar un proceso administrativo en el cual desde el principio hasta el final aflora el prejuicio o, al menos, la ineficiencia de los administradores del proceso. Nos explicamos.

En la notificación de cargos de fecha 6 de abril de 2004 se implicó al Agente García Natal en lo que el entonces Superintendente Agustín Cartagena Díaz caracterizó como un *"espectáculo sexual"*, cuando dicho agente no tuvo participación alguna en el mismo. Luego, a pesar de que en la vista celebrada el 21 de octubre de 2004 no surgió prueba que implicara al recurrente con dicho incidente, el 10 de mayo de 2005, el nuevo Superintendente Lcdo. Pedro Toledo Dávila reiteró dichas imputaciones infundadas. Ello, al expulsar de la uniformada al recurrente basado en la *"Resolución de Cargos"* que lo implicó en el denominado *"espectáculo sexual"*.

Así también, la CIPA repitió las fallas antes señaladas al indicar al final de su Resolución que la prueba ubicaba a los *"co-apelantes, proveyendo los medios que propiciaron un espectáculo inmoral y detrimental"*, y que *"cooperaron activamente en la configuración de un acto denigrante y contrario a la dignidad de una persona detenida"*, y que *"era deber de los co-apelantes desalentar en sus compañeros la conducta [...] denunciada"*.

Dichas imputaciones, en cuanto al Agente García Natal se refiere, son totalmente improcedentes e infundadas porque no se presentó la más mínima prueba para sostenerlas. Es por ello que en su comparecencia ante nos, el Procurador General expresó: *"[r]econocemos que el señor García Natal no participó de esos eventos"; y se limitó a tratar de sostener que el uso del gas pimienta por el recurrente fue innecesario e injustificado, y que ello "constituyó un claro e indudable abuso de autoridad."* Sin embargo, dicha conclusión no está sostenida al considerar la totalidad del expediente administrativo. En contrario, lo que el récord refleja es que la actuación del Agente García Natal fue razonable bajo las circunstancias de aquel momento.

El gas pimienta se utiliza para neutralizar, sin causar daño severo, a una persona que presente una amenaza a la seguridad de la Policía o de terceras personas. El Agente García Natal pudo observar que sus compañeras estaban forcejeando con la detenida y que la seguridad corporal de éstas podía estar en riesgo. En ese momento, tomó la decisión de aplicar el gas pimienta a la joven para que ésta se calmara y las agentes pudieran controlarla.

El Procurador General argumenta que el uso del gas pimienta era innecesario, ya que la detenida estaba

esposada al momento en que se le aplicó el mismo. Sin embargo, tanto el testimonio de la Agente Cintrón Ocasio, como el de la Agente Edith Miranda Berdecia, señalan que aún después de esposada, la detenida continuó ofreciendo resistencia y forcejeando. Inclusive, estaba tratando de morder a las agentes, y fue después que el Agente García Natal le roció el gas pimienta que pudieron controlarla. Cabe recordar que dicho forcejeo ocurrió dentro de una celda en un cuartel de la Policía, un lugar donde no se pueden permitir agresiones a los miembros de la Uniformada por el riesgo a la seguridad colectiva que ello presenta. En esas circunstancias, la decisión del Agente García Natal no puede considerarse irrazonable. En el peor de los casos, pudo ser un error de juicio, pero no una falta.

Este Tribunal no tiene duda de que la conducta del Agente García Natal en ese momento no ameritaba su expulsión de la Policía de Puerto Rico. Ni siquiera una suspensión temporera, pues el recurrente lo que hizo fue cumplir con su deber como agente del orden público. Además, al recurrente no se le imputó violaciones a algún reglamento que establezca parámetros específicos sobre el uso del gas pimienta. No surge del recurso que tal reglamento exista en la Policía. A tenor de ello, no se puede imputar al recurrente ninguna violación por la decisión de utilizar el gas pimienta en las circunstancias en que lo hizo.

En síntesis, es evidente que la CIPA abusó de su discreción, y actuó arbitraria, caprichosa e irrazonablemente al implicar al recurrente en el llamado *"espectáculo sexual"* ocurrido el 24 de noviembre de 2003 en el Cuartel de Puerta de Tierra. Ello, aún después de reconocer que la participación de éste fue posterior a dicho incidente, y que sólo tuvo que ver con la utilización de gas pimienta en dicho recinto policíaco. Por tanto, no podemos avalar la determinación de la CIPA de encontrar incurso al recurrente de las Faltas Graves #1 y #27, igual que a los demás agentes que sí participaron en dicho incidente. Además, no surge de autos que el recurrente hubiese violado reglamentación alguna ni abusado de su autoridad al utilizar el gas pimienta en las circunstancias en que lo hizo. Se cometieron los errores planteados en el recurso.

## IV

Por los fundamentos antes expuestos, se revoca la Resolución recurrida. En consecuencia, se ordena a la Policía de Puerto Rico que reinstale al Agente García Natal en el puesto que ocupaba en dicho organismo, con el pago de los haberes dejados de percibir desde el 22 de junio de 2005.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2008 DTA 74

**1.** Notificada el 2 de noviembre de 2007.

**2.** La detenida se identificó a la Policía como Jean Nichole Rosado. Posteriormente surgió que se trataba de la menor A.D.M. L.

**3.** Notificada al recurrente el 28 de mayo de 2004.

**4.** Notificada al recurrente el 22 de junio de 2005.

**5.** Véase, a la pág. 15 del Escrito en Cumplimiento de Orden.

**6.** Véase, transcripción de vista celebrada el 4 de abril de 2006, pág. 56, líneas 13-25, y pág. 57, línea 1.

**7.** Véase, transcripción de vista de 4 de abril de 2006, pág. 63, líneas 11-25, y pág. 64, líneas 1-15.

8. Véase Resolución de la CIPA, a la pág. 3 del Apéndice del Recurso.

9. Reglamento Núm. 4216.